SOUTHWICK, P. J.,
for the Court:
¶ 1. The buyer in a real estate contract brought suit against the sellers for specific performance. After various hearings, motions, settlement discussions, and a two year delay when a party did not present its motion for reconsideration, a decree was entered enforcing the contract. The sellers appeal alleging that the lower court failed to appreciate that the statute of frauds, limitations, laches, and' general waiver issues barred relief. We disagree and affirm.
FACTS
¶ 2. Danny and Janis Brown are the record owners of an apartment house located at 506 Burke Avenue in Long Beach, Mississippi. On March 6, 1994, the Browns entered into a written contract for the sale of this property to Sheila Ann Thomas. Jerry Schroeder was the Browns’s real estate agent and co-defendant at trial. Schroeder is not a party on appeal. The terms of the contract were a sale price of $120,000 with a down payment of $20,000. The contract provided that the owner would finance “a Wrap Mortgage of $100,000, with a monthly payment of $1,365 for a maximum of 36 months.” A balloon payment of the remaining principal would then be due.
¶ 3. The closing date of March 31, 1994, came and went. On June 2, 1994, Thomas sued the Browns and Schroeder for specific performance or in the alternative for damages. The Browns asserted the defense of impossibility of specific performance, saying that their mortgage was not assumable since it had a “due-on-sale” clause. They filed a counterclaim for tor-tious interference with a business relationship and sought sanctions for frivolous litigation.
¶ 4. A chancery court trial commenced November 15, 1994. On the next day, the parties reached a settlement that was read into the record. The effect of the settlement was to make explicit some details of the “wrap-around mortgage.” According to the dictated settlement, the existing loan was from Bailey Mortgage Company secured by a deed of trust on the property. The buyer-Thomas agreed to make payments on a $100,000 loan from the sellers computed at an 8% rate amortized over 15 years. She would pay the amount neces1-sary to keep the note current directly to Bailey and send the remainder of the required $1,365 installment payment to the sellers. At the end of 36 months, Thomas was to pay off the Bailey mortgage and submit a final payoff amount to the Browns. Only at that time would the two realtors involved receive their commissions of 5% each.
¶5. The $1,365 monthly payment was more than the principal and interest due on the $100,000 loan, and that monthly surplus would reduce the principal. Closing was to occur no later than March 1, 1995, with a right for the buyer to inspect prior to that time. The parties in open court agreed that a new contract would be prepared. After considerable debate, it was decided that Thomas’s realtor would prepare it. The sellers’ attorney was to prepare the judgment, which would be submitted after a contract was signed. The chancellor questioned both Thomas and the Browns as to whether this was their agreement. They each answered affirmatively.
¶ 6. The disagreements continued and no new contract was ever signed. The seller-Browns paid off the balance of the existing loan to Bailey Mortgage apparently without informing Thomas. The chancellor entered an order that was filed on March 20, 1995 that set out the terms of the November 1994 settlement. This March 20 order referred to the need to close by March 1, *1093 three weeks earlier, and stated that the purchase would be subject to Bailey’s no-longer existing mortgage. The order also dismissed the suit. The buyers and the court may well not have known yet of the satisfying of the Bailey loan. The sellers’s attorney did not sign as approving the order.
¶ 7. On March 27, 1995, the seller-Browns filed a motion to reconsider. They notified the court that Bailey’s loan had been satisfied. They requested that the chancellor enforce the agreement of the parties without assumption of or consideration of the mortgage against the property which they had paid in full. Thomas filed a motion in opposition to the Browns’s motion to reconsider. Thomas’s point was that part of each required $1,365 payment included taxes and insurance, since the payment Thomas was to make monthly to Bailey Mortgage included an amount to be placed in escrow for those purposes. By paying off the Bailey loan,' but still trying to receive $1,365 per month, the sellers might insist at the time for purchasing insurance or paying taxes that these obligations solely belonged to Thomas. If so, the cash outlay during the first three years of the loan5 would be higher than the buyer had contemplated: under the contract it was only $1,365 per month which includéd the sums in escrow, while now it might be $1,365 and an added amount for taxes and insurance. Thomas computed the excess as $14,514 over the three years. She wanted clarification of her obligations.
¶ 8. The motion to reconsider languished for two years. The seller-Browns filed it but never set it for a hearing. Finally the buyer-Thomas requested a hearing so the chancellor could rule on the pending motions. On July 16, 1997, the parties again tried but failed to agree to terms of a settlement, so they both submitted proposed findings of fact and conclusions of law. On December 29, 1998, the chancellor entered a judgment for buyer-Thomas. He stated that the original issues were resolved by the agreement of November 16, 1994. He stated that Thomas was justified in not proceeding with the closing after the mortgage loan had been paid in full by the seller, due to the uncertainties about tax and insurance obligations. We do not find in the 1998 order any decision as to how the formerly escrowed items were to be handled, but neither party raises that here. The court faulted the sellers for not setting the motion for hearing. The chancellor granted the motion to reconsider only to the extent that-the sale of the property would continue despite the payoff of the Bailey mortgage.
¶ 9. No sale apparently has yet occurred, as the Browns perfected this appeal.
DISCUSSION

I. Statute of Limitations, Statute of . Frauds, Laches

¶ 10. Because these three issues all deal with the alleged delay of buyer-Thomas in effecting the settlément agreement between the parties, we will treat them together. The Browns state that the parties first entered into an oral agreement for the purchase of the property on November 16, 1994, when ■ the settlement agreement was read into the record in chancery court. They argue that because buyer-Thomas failed to submit a written contract reflecting this agreement within 30 days, the oral agreement to reduce to writing a promise to convey land is void under the statute of frauds. Miss.Code Ann. § 15-3-1 (Rev.1995). Since the order filed on March 20, 1995 repeated the November 1994 settlement.terms, including that Thomas was to present a contract within 30 days from the date of the order, the buyer-Browns also waived, lost by statute of limitations or laches, or otherwise forfeited all rights.
¶ 11. Preliminarily we note that whatever was not done after the order filed March 20, 1995, was not done because the Browns filed a motion to reconsider on March 27. That put Thomas’s as well as the Browns’s obligations on hold.
*1094 ¶ 12. The Browns argue that when an agreement is statutorily required to be in writing and signed by the parties, it is not effective even if dictated into the record at trial. They cite a precedent addressing a statutory requirement that an agreement to divorce based on irreconcilable differences must be in writing and signed by the parties, a requirement that is not satisfied by a settlement agreement being read into the record but not signed. Cassibry v. Cassibry, 742 So.2d 1121, 1125 (Miss.1999).
¶ 13. With respect for the sellers’ attorney’s efforts on his clients’ behalf, this is fanciful. The Browns are quite correct that a contract for sale of real estate must be in writing and signed by the parties. However, a written contract for sale was signed by both parties on March 6, 1994, and it contained sufficient terms to withstand the statute of frauds. Certain elaborations appeared in the November 1994 settlement, but those were interpretations of a written contract and not the sole evidence of one. Therefore we need not be concerned with whether Cassibry has any relevance to general statute of fraud issues or is limited to the specific irreconcilable differences divorce statute that it interpreted. Miss.Code Ann. § 93-5-2(3) (Rev.1994).
¶ 14. The original contract, which represents a meeting of the minds, is contained in the trial record. The order filed March 20, 1995, reiterated and explained those terms. The same amount of money, the same financing scheme and the same obligations existed in both the March 1994 contract for sale and the court’s March 1995 order. The only difference had to do with the procedure for making payments which finally in March 1995 acknowledged Bailey Mortgage by name instead of just an anonymous mortgagee. The order dismissed buyer-Thomas’s suit because of the recognition by the parties that the sale would go forward. The Browns’s filing of a timely motion for reconsideration made it doubtful that both parties in fact did recognize that these obligations still existed.
¶ 15. Secondly, the Browns argue that because four years passed after the November 1994 hearing and the December 29, 1998 order, Thomas has exceeded the all-purpose, three year statute of limitations. Miss.Code Ann. § 15-1-49 (Rev. 1995). The Browns faded to raise the statute of limitations issue at the trial level in their motion to dismiss. Therefore the issue is waived. Handley v. State, 574 So.2d 671, 678 (Miss.1990). Quite simply, though, a statute of limitations is a bar to the commencement of proceedings on a cause of action. It has no relevance to the delays that occur within litigation that has already been commenced.
¶ 16. Finally as to delay, the sellers argue that the doctrine of laches should block relief to the buyer. A party seeking successfully to invoke the doctrine of laches must show: (1) delay in asserting a right or claim, (2) that the delay was not excusable, and (3) that there was undue prejudice to the party against whom the claim is asserted. Allen v. Mayer, 587 So.2d 255, 260 (Miss.1991). As with the statute of limitations, this supplemental doctrine applies to the failure to bring an action, not with a delay internal to that action. Thomas asserted her claim long ago.
¶ 17. A failure to prosecute an action with reasonable promptness once it has been brought may lead to its dismissal, but that relief was not requested. Had it been, the chancellor’s view that it was the sellers, the Browns, who had delayed the action by failing to call their motion up for hearing would have been relevant. Moreover, the last 17 months of the delay was between the hearing held at the buyer-Thomas’s request and the chancellor’s entering his order. Even if some general principle of timeliness applied here, Thomas has not inexcusably delayed the action.
¶ 18. The Browns assert that the delay has cost them money because of the appre *1095 ciation of land values in the wake of the institution of gaming on the Gulf Coast. Perhaps this assertion hints as to the basis of the difficulty in the closing of this sale on the terms reached in March 1994. Regardless, none of the doctrines that the sellers argue prevent this sale from occurring.

II. Changing of terms, reviving oral agreement

¶ 19. The Browns argue that the chancellor “resurrected from the grave a mortgage” that was irrelevant to the agreement between the parties forged in court November 16, 1994. They insist that the settlement agreement included no mention of a pre-existing mortgage, or assumption of such a mortgage or a wrap-around mortgage in the settlement agreement..
¶ 20. The March 1994 contract definitely mentioned but did not name a preexisting mortgage when it used the word “wrap.” A “wrap-around mortgage” involves an existing loan and a new one. “The wrap-around borrower [Thomas here] must make payments on the first mortgage debt to the wrap-around lender [the seller Browns], who, as required by the wrap-around agreement, must in turn make payments to the first mortgage debt to the third party, the first mortgagee [Bailey Mortgage].” GeoR&e E. Osborne, Grant S. Nelson, and Dale A. Whitman, Real Estate Finance Law § 5.16 (1979) at 279. Bailey was not some unwanted guest invited after-the-fact by Thomas the buyer. That some mortgage company existed and was integral to the terms of the agreement was known from the beginning.
¶ 21. The Browns essentially argue that the in-court November 1994 agreement eliminated the wrap-around feature. To the contrary, though the attorneys’ initial dictation into the record did not mention a prior mortgage, each party and the judge continued to flesh out the understanding. The sellers ’ attorney stated “we represent that there is only one mortgage against the property at the present time, and she [Thomas the buyer] knows that she will take title subject to that mortgage.” Quite differently than this statement in November 1994, the sellers now argue that the buyer did not know and, in fact, was not taking title subject to another mortgage. The chancellor correctly found in his December 1998 judgment that “there was a mortgage against the property, and the plaintiff agreed in the settlement announced to the Court to purchase the property subject to that mortgage. The terms of the sale were to be the same as in the original contract with the closing costs unchanged.”
¶ 22. We agree with the Browns that one part of the November 1994 agreement was changed by the chancellor in December 1998. This was the change:
the agreement of the parties failed to include a provision that the Plaintiff was to provide insurance during the three-year owner financed period since the payments to Bailey Mortgage included insurance and property taxes escrowed into the monthly payments. The Court further finds that since the Defendants [paid] off the mortgage, this altered the terms of the settlement agreement and gave rise to a legitimate dispute between the parties.
¶ 23. The chancellor had to acknowledge a change in the agreement that was necessitated by the sellers’ unilateral action. How exactly taxes and insurance are to be paid now is unclear to us,, but absent either party’s complaint that the chancellor failed to address this troubling issue, it is unnecessary for us to do more than mention it.
¶ 24. An appellate court will uphold a chancellor’s fact-finding if “supported by substantial evidence unless the Court can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard.” Cummings v. Benderman, 681 So.2d 97, 100 (Miss.1996). None of those defects exist. Indeed, based on these facts, any different *1096 decision than the one the chancellor reached would have been almost untenable.
¶ 25. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT OF DENIAL OF THE MOTION TO DISMISS, GRANT OF THE MOTION TO RECONSIDER JUDGMENT WITH RESPECT TO THE MATERIAL CHANGES, AND ORDER OF SALE UNDER THE OUTLINED TERMS OF SALE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO APPELLANTS.
McMILLIN, C.J., KING, P.J., BRIDGES, IRVING, LEE, MOORE, AND PAYNE, JJ., CONCUR.
THOMAS, J., NOT PARTICIPATING.